IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**JAMES PERRY PENIX,**

**Plaintiff,**

vs.                                                   Civ. No. 21-960  JFR

**KILOLO KIJAKAZI, Acting Commissioner,**
**Social Security Administration,**

**Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record

(Doc. 20)[2] filed April 4, 2022, in connection with Plaintiff's *Motion to Reverse and Remand for*

*Rehearing With Supporting Memorandum,* filed June 6, 2022.  Doc. 23.  Defendant filed a

Response on August 8, 2022.  Doc. 25.  Plaintiff filed a Reply on August 22, 2022.  Doc. 26.

The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C.

§§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law

and being fully advised in the premises, the Court finds that Plaintiff's motion is well taken and

is **GRANTED**.

### I.  Background and Procedural Record

Plaintiff James Perry Penix (Mr. Penix) alleges that he became disabled on July 9, 2015,

at the age of fifty-one years and six months, because of back pain, including lumbar spondylosis

and lumbosacral spondylosis; abdominal pain, including hernia; diabetes mellitus, including

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Doc. 17.)

[2] Hereinafter, the Court's citations to Administrative Record (Doc. 20), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

diabetic neuropathy; obesity; and obstructive sleep apnea.  Tr. 38, 148, 151.   Mr. Penix completed the sixth grade and later obtained his GED.  Tr. 62.  Mr. Penix worked as a commercial truck driver.  Tr. 188-95.  Mr. Penix stopped working on October 28, 2014, due to his medical conditions.  Tr. 128.  Mr. Penix's date of last insured is December 31, 2019.[3]  Tr. 13. Therefore, to receive disability insurance benefits, Mr. Penix must show he was disabled prior to that date.  *See Potter v. Sec'y of Health & Human Servs*., 905 F.2d 1346, 1347 (10th Cir. 1990).

On May 13, 2015, Mr. Penix protectively filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq*.  Tr. 128-29.  On August 7, 2015, Mr. Penix filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. Tr. 440-45.   Mr. Penix's applications were initially denied, and denied again at reconsideration. Tr. 64-68, 81, 452-53.  Upon Mr. Penix's timely request, Administrative Law Judge (ALJ) Jennifer Fellabaum held a hearing on October 2, 2019.  Tr. 28-63.  Mr. Penix appeared with attorney representative Laura Johnson.  *Id*.  On December 12, 2019, ALJ Fellabaum issued a partially favorable decision.  Tr. 6-21.  On August 18, 2021, the Appeals Council denied Mr. Penix's request for review and upholding the ALJ's final decision.  Tr. 1-5.  On September 30, 2021, Mr. Penix timely filed a Complaint seeking judicial review of the Commissioner's final decision.  Doc. 1.

---

[3] To qualify for DIB, a claimant must establish that he met the statutory requirements for disability on or before his date of last insured. *See* 42 U.S.C. §§ 416(i)(3), 423(c)(1); *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010).

## II.  Applicable Law

### A.     Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals).  The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

> (1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[4]  If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.
>
> (2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, he is not disabled.
>
> (3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.
>
> (4) If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity

---

[4] Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a).  "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. §§ 404.1572(b).

("RFC"). *Id.* §§ 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work.  Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands.  A claimant who is capable of returning to past relevant work is not disabled.

(5) If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n.5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy.  *Id.*  A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

**B.**     **Standard of Review**

The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).  A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]"  *Langley,* 373 F.3d at 1118, or if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371,

1374 (10th Cir. 1992).  Therefore, although an ALJ is not required to discuss every piece of

evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the

[ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient

particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Further, the decision

must "provide this court with a sufficient basis to determine that appropriate legal principles

have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).  In undertaking

its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the

agency.  *Langley*, 373 F.3d at 1118.

### III.  <u>Analysis</u>

The ALJ issued a partially favorable decision.  The ALJ determined that Mr. Penix met

the insured status requirements of the Social Security Act through December 31, 2019, and that

he had not engaged in substantial gainful activity from his amended alleged onset date of July 9,

2015, through his date last insured.  Tr. 13.  She found that Mr. Penix had severe impairments of

type 2 diabetes mellitus, diabetic neuropathy, and obesity.  *Id.*  The ALJ also found that

Mr. Penix had medically determinable impairments due to substance abuse disorder, obstructive

sleep apnea, hypertension, ventral hernia, diverticulosis, and internal hemorrhoids that were not

severe, considered separately or in combination.  *Id.*  The ALJ determined that since July 9,

2015, Mr. Penix's impairments did not meet or equal in severity any of the listings described in

the governing regulations, 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 19-23.

The ALJ  determined that prior to January 8, 2019, Mr. Penix was an individual closely

approaching advanced age, but that on that date Mr. Penix's age category changed to an

individual of advanced age.  *Id.*  The ALJ explained that prior to January 8, 2019, the

transferability of job skills is not material to the determination of disability because using the

Medical-Vocational Rules as a framework supports a finding that Mr. Penix was "not disabled" whether or not he had transferable job skills. *Id.* Accordingly, the ALJ proceeded to step four and found that from July 9, 2015, through January 8, 2019, Mr. Penix had the residual functional capacity to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally crouch, kneel, crawl, and climb ramps and stairs, can never climb ladders, ropes, or scaffolds, or be exposed to unprotected heights or hazardous machinery; and can occasionally use foot controls bilaterally.

Tr. 14-19. The ALJ determined that from July 9, 2015, through January 8, 2019, Mr. Penix could not perform his past relevant work. Tr. 19. The ALJ determined that prior to January 8, 2019, considering Mr. Penix's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform.[5] The ALJ determined, however, that beginning on January 8, 2019, when Mr. Penix turned 55 years of age, Mr. Penix was unable to transfer job skills to other occupations rendering him disabled by direct application of Medical-Vocational Rule 202.06. Tr. 19-20.

In support of his Motion, Mr. Penix argues that (1) the ALJ erred by failing to properly weigh the opinion of consultative examiner John R. Vigil, M.D.; (2) the ALJ failed to properly weigh the opinion of treating physician Raul A. Herrera Pena, M.D.; and (3) the ALJ's RFC is not based on substantial evidence because she failed to account for Mr. Penix's subjective allegations of pain and other symptoms contrary to case law and Social Security Rulings 96-8p and 16-3p.

---

[5] The vocational expert testified that Mr. Penix would be able to perform the requirements of representative occupations such as a Garment Sorter, DOT #222.687-014, which is performed at the light exertional level with an SVP of 2 (205,000 jobs in national economy); a Mail Clerk, DOT #209.687-026, which is performed at the light exertional level with an SVP of 2 (130,000 jobs in the national economy); and a Laundry Classifier, DOT #361.687-014, which is performed at the light exertional level with an SVP of 2 (41,000 jobs in the national economy). Tr. 20.

For the reasons discussed below, the Court finds that the ALJ failed to apply the correct legal standard in weighing Dr. Vigil's opinions and that the ALJ's explanations for rejecting Dr. Vigil's opinions are not supported by substantial evidence. This case, therefore, requires remand.

A. **Medical Evidence**

1. **Mary Ann Osuchowski-Sanchez, Ph.D., CFNP**

On July 9, 2015, Mr. Penix presented as a new patient to Mary Ann Osuchowski-Sanchez, Ph.D., CFNP, of Your Health First Medical Clinic in Las Vegas, New Mexico. Tr. 380-81. Mr. Penix requested medication refills for type 2 diabetes mellitus, hypertension and hyperlipidemia. *Id*. Mr. Penix reported not checking his glucose for lack of supplies and taking medications he purchased in Mexico or borrowed from friends. *Id.* Mr. Penix complained of an abdominal hernia and neuropathic pain to his lower extremities. *Id.* Mr. Penix reported taking morphine for pain that he borrowed from friends. *Id.* On physical exam, CFNP Osuchowski-Sanchez noted, *inter alia*, that Mr. Penix was obese, had midline abdominal tenderness, and decreased sensation to his lower extremities. *Id.* She assessed Mr. Penix with sleep apnea disorder, obesity, abdominal hernia, neuropathy, hyperlipidemia, hypertension, and diabetes mellitus. *Id.* CFNP Osuchowski-Sanchez prescribed Metformin, Lisinopril, Simvastatin and Gabapentin; ordered an abdominal ultrasound; referred Mr. Penix for a colonoscopy and to podiatry; and discussed with Mr. Penix the risks associated with poorly treated diabetes, hyperlipidemia and obesity. *Id.*

On July 28, 2015, Mr. Penix returned for follow up on lab and ultrasound results. Tr. 382-83. Mr. Penix reported that he continued to have leg and foot pain that interfered with his sleep even with increased Gabapentin. *Id.* CFNP Osuchowski-Sanchez's physical exam was

remarkable for soft mass to periumbilical area and gait assisted with cane.  *Id.*   She increased Gabapentin and prescribed Vitamin D2 and Invokana.[6]  *Id.*

On August 13, 2015, Mr. Penix saw CFNP Osuchowski-Sanchez and presented forms for obtaining a handicap placard due to chronic pain in his legs and difficulty walking distances.  Tr. 384-85.  Mr. Penix reported difficulty sleeping due to poorly fitted CPAP mask.  *Id.*  Mr. Penix had not followed up with podiatry.  *Id.*  CFNP Osuchowski-Sanchez's physical exam was remarkable for tenderness to lower legs and back.  *Id.*  CFNP Osuchowski-Sanchez completed paperwork for a handicap placard and ordered a new CPAP mask and tubing.  *Id.*

Mr. Penix saw CFNP Osuchowski-Sanchez eleven more times over the next eighteen months.  Tr. 386-413.  In addition to her ongoing treatment of Mr. Penix's diabetes, hypertension and hyperlipidemia, she noted Mr. Penix's  consistent complaints of chronic lower back, right hip, left knee, lower leg and foot pain.  Tr. 388, 390, 392, 394, 397, 400, 406, 408.  During this time, CFNP Osuchowski-Sanchez's physical exams were remarkable for tenderness to right hip and left knee areas (Tr. 391, 393, 395), tenderness to lower extremities from hips to toes (Tr. 398), joint and soft tissue tenderness to back and lower extremities (Tr. 401), musculoskeletal deformity (Tr. 404, 407), and tenderness to joints of hip, knees, and feet (Tr. 409, 412).  On November 28, 2016, Mr. Penix, at the urging of his disability lawyer, requested a prescription for the cane he was already using, which CFNP Osuchowski-Sanchez provided.  Tr. 410.  On November 28, 2016, CFNP Osuchowski-Sanchez referred Mr. Penix for a physical therapy evaluation for "fitness testing, back pain, hip pain, knee pain and leg/foot pain."  *Id.*  She also referred Mr. Penix to a pain specialist.  *Id.*

---

[6] Mr. Penix's insurance provider denied coverage of this prescribed drug.  Tr. 384.

### 2.   Presbyterian Healthcare Services

#### a.   Quyah-Anh Bui, M.D.

On August 9, 2017, Mr. Penix presented to Quyah-Anh Bui, M.D., for diabetes medication refills.  Tr. 226-35.  Mr. Penix brought his records from Your Health First Medical Clinic.  Tr. 226.  Mr. Penix reported being homeless and staying at different friends' houses and not wanting assistance with smoking cessation until his life is less stressful.  *Id.*  Dr. Bui's physical exam was unremarkable.  Tr. 227.  Dr. Bui obtained lab work and prescribed various medications.[7]

#### b.   Charles F. Benton, M.D.

On October 17, 2017, Mr. Penix presented to Charles F. Benton, M.D., to establish care. Tr. 266-72.  Mr. Penix complained of diabetes, knee pain, right hip pain, foot pain and other chronic problems.  Tr. 266.  Dr. Benton noted that Mr. Penix's diabetes was controlled, but that Mr. Penix reported numbness, tingling and pain on the soles of his feet.  *Id.*  Dr. Benton noted that Mr. Penix's obstructive sleep apnea was stable; his hypertension was stable, although he had bilateral leg swelling; and his hyperlipidemia was stable.  Tr. 266-67.  Dr. Benton's physical exam was positive for a hernia in the ventral area.  Tr. 269.  Dr. Benton assessed type 2 diabetes with polyneuropathy, hypertension, obstructive sleep apnea, moderate tobacco use disorder, obesity, and epigastric abdominal pain.  Tr. 270.  Dr. Benton referred Mr. Penix to gastroenterology.[8]  Tr. 271.

---

[7] Much of this record is illegible due to poor copy quality.

[8] On March 19, 2018, Mr. Penix presented to Gastroenterologist Nina Nandy, M.D., for abdominal pain.  Tr. 290-94. On physical exam Dr. Nandy noted, *inter alia*, obesity and "ambulates w/cane."  Tr. 291.  Dr. Nandy obtained lab work and planned to obtain a colonoscopy to screen for colon cancer and rectal bleeding.  Tr. 293-94.  On May 3, 2018, Mr. Penix had a colonoscopy during which three benign polyps were removed and which demonstrated diverticulosis and internal hemorrhoids.  Tr. 295-303.

On February 20, 2018, Mr. Penix saw Dr. Benton for follow up of chronic pain and other chronic health problems.  Tr. 273-89.  Dr. Benton noted that Mr. Penix's diabetes was controlled, and that his hypertension, hyperlipidemia and obstructive sleep apnea were stable.  Tr. 273-74. Dr. Benton noted that Mr. Penix's chronic pain was unstable and worsening for 2-3 weeks.  Tr. 274.  Mr. Penix reported arthritic pain in his ankles and knees, and pain in his feet due to neuropathy.  *Id.*  Dr. Benton's physical exam was remarkable for tenderness in the left lower abdominal quadrant and tenderness on palpation of ankles and toes.  Tr. 277.  Dr. Benton continued Mr. Penix on Gabapentin and prescribed Meloxicam for arthritic pain.  Tr. 278.

On July 26, 2018, Mr. Penix saw Dr. Benton for follow up of diabetes and other chronic health problems.  Tr. 340-48.  Dr. Benton noted that Mr. Penix's diabetes as not properly controlled; however, his hypertension, hyperlipidemia, and joint pain were stable.  *Id.*  On physical exam, Dr. Benton indicated no edema or tenderness of the bilateral lower extremities. Tr. 344.

### c.      Raul Alberto Herrera Pena, M.D.

On October 22, 2018, Mr. Penix presented to Raul Alberto Herrera Pena, M.D., to establish care and for medication management of diabetes, hypertension and hyperlipidemia.  Tr. 349-52.  Mr. Penix specifically complained of neuropathy.  *Id.*  Dr. Pena's physical exam was unremarkable.  Tr. 350.  Dr. Pena assessed type 2 diabetes mellitus with diabetic polyneuropathy, hypertension and hyperlipidemia, all of which he noted as stable.  *Id.*  Dr. Pena indicated that Mr. Penix should continue on his current therapies and that he would consider switching from Gabapentin to Nortriptyline to address the neuropathy.  *Id.*

On April 22, 2019, Mr. Penix saw Dr. Pena for follow up.  Tr. 372-76.  A diabetes foot exam was positive for "dry cracked skin, open sores, or drainage," and swelling.  Tr. 372-73.

10

Mr. Penix also complained of right flank pain for two months.  Tr. 373.  Dr. Pena's physical exam was remarkable for flank tenderness but no palpable abnormalities.  Tr. 374.  Dr. Pena assessed type 2 diabetes with polyneuropathy, not well controlled; hypertension, stable; hyperlipidemia, stable; and bilateral flank pain with no palpable abnormalities.  Tr. 375.

### 3.     John R. Vigil, M.D.

On August 14, 2019, based on a referral by his disability attorney, Mr. Penix presented to John R. Vigil, M.D., for a consultative examination/impairment rating.  Tr. 418-23.  Mr. Penix's disabling complaints included chronic low back pain, bilateral lower extremity pain, bilateral knee pain, neuropathic pain of the feet, chronic left shoulder pain, chronic right wrist pain, abdominal pain due to ventral hernia, and sleep apnea.  Tr. 418-19.  Dr. Vigil indicated he reviewed medical records from Your Health First Medical Clinic and Presbyterian Medical Group, and function reports prepared by Mr. Penix and his daughter.  Tr. 419.

Mr. Penix described having chronic, 8/10, daily pain in his low back, both feet, left knee, and right hip.  Tr. 419.  He described associated numbness and paresthesias of the hands and feet.  *Id.*  Mr. Penix stated that nothing alleviates his pain except for cannabis concentrates which he uses all day.  *Id.*  Mr. Penix reported he could manage his personal care, was able to sit all day, and could walk and/or stand for five to ten minutes.  *Id.*  He reported he did not do house work or yardwork because he is homeless, but that this type of activity would aggravate his pain and he would not be able to do it.  *Id.*  Mr. Penix reported he was able to drive, go to the grocery store, and able to lift no more than 25 pounds.  *Id.*  Mr. Penix reported difficulty with stairs for fear of his knees giving out and falling.  *Id.*

11

Dr. Vigil administered a pain disability questionnaire which indicated Mr. Penix had a moderately severe to severe problem with chronic pain affecting his activities of daily living.  Tr. 420.

Mr. Penix reported being married and going through a divorce and currently living in Albuquerque "on the streets in his car."  *Id.*  Mr. Penix reported smoking one to two packs of cigarettes a day and smoking cannabis all day long for pain.  *Id.*  Mr. Penix denied alcohol use except for once a month.  *Id.*

Dr. Vigil observed that Mr. Penix was grossly obese, in no acute distress, cooperative, exhibited normal and appropriate pain behavior during exam, and walked slowly and stiffly with a limp favoring the left lower extremity.  Tr. 421.  On physical exam, Dr. Vigil indicated, *inter alia*, a large easily reducible ventral hernia, decreased sensation in a classic stocking and glove distribution, and some hypersensitivity to light touch in the bottoms of the feet.  *Id.*  Dr. Vigil's musculoskeletal exam demonstrated

> **Gait:  Gait is slow and antagic [sic].  He is able to get up on his toes and heels only momentarily and cannot stay on them.  He is unable to complete a full squat and does not hop.  He is able to assume the upright position from the chair without assistance.  He is able to get up on the exam table on his own with some difficulty.  He is also able to move from the supine to the prone position on the examination table with moderate pain and some difficulty.**
>
> **Examination of the neck reveals normal range of motion with no tenderness of the paraspinous neck muscles.**
>
> **Examination of the back reveals moderate lumbar tenderness to palpation. There is also some bilateral paraspinous muscle tenderness with right SI joint tenderness.  Straight left is negative bilaterally.  I do not appreciate any muscle atrophy of the quadriceps or gastroc muscles,**
>
> **Examination of the knees reveals medial joint line tenderness on the left with no effusion or swelling.  There is some patellar crepitus noted bilaterally and he has good range of motion.  The joints are stable.**

**Examination also reveals significant tender pressure points that are symmetrical in his occiput, scapula, sterile clavicular joints, elbows, hips, suggesting fibromyalgia.**

Tr. 421-22.  (Bolded in original.)

Dr. Vigil assessed (1) chronic pain secondary to diabetic neuropathy and osteoarthritis; (2) severe morbid obesity; (3) tobacco use disorder; (4) obstructive sleep apnea; (5) poorly controlled diabetes mellitus; (6) obstructive sleep apnea; (7) dyslipidemia; (8) chronic abdominal pain secondary to large ventral hernia; and (9) probable fibromyalgia.  Tr. 422.  Dr. Vigil concluded as follows:

> [a]fter careful review of the medical record and conducting a consultative evaluation and functional impairment rating of Mr. James Penix, it is my opinion that within a reasonable medical probability that this patient has moderate to moderately severe functional limitations and is moderately to severely limited functionally in both vocational and avocational activities secondary to his chronic pain secondary to multiple factors including peripheral neuropathy, fibromyalgia, and arthropathy secondary to arthritis.  Medical records and my evaluation indicate that he has significant pain with moderate activity as well as at rest and that he has moderate problems with many aspects of activities of daily living.
>
> His co-occurring morbid obesity and sleep apnea are also contributing to his functional impairments.  I also think he has probably some undiagnosed and untreated depression contributing.
>
> . . .

Tr. 422-23.[9]

On August 31, 2019, Dr. Vigil completed a *Medical Assessment of Ability To Do Work-Related Activities (Physical)* and a *Medical Assessment of Ability To Do Work-Related Activities (Non-Physical)* on Mr. Penix's behalf.  Tr. 415-16.  As to the former, Dr. Vigil assessed that considering Mr. Penix's medical history and the chronicity of findings as from

---

[9] On September 12, 2019, Dr. Pena provided a letter to Mr. Penix's disability attorney stating, "I have reviewed the report done on James Penix by Dr. John Vigil, MD dated August 14, 2019.  **I do concur** with the findings and conclusions of Dr. Vigil regarding Mr. James Penix conditions."  Tr. 439 (emphasis in original).

before October 2014 to current examination, Mr. Penix can occasionally lift and/or carry less than ten pounds; can frequently lift and/or carry less than five pounds; can stand and/or walk less than two hours in an eight-hour workday; requires the use of an assistive device to ambulate, balance and/or reduce pain; can sit less than four hours in an eight-hour workday; can never use foot controls; could occasionally reach/handle/finger; and can never kneel, stoop, crouch, or crawl.  Tr. 415.  As to the latter, Dr. Vigil assessed that Mr. Penix suffers from a pain producing impairment, injury or sickness; that his pain is severe; that he suffers from sleep disturbances due to pain; that he suffers from fatigue as a result of his impairments; and that he has to rest or lie down at regular intervals because of his pain and/or fatigue.  Tr. 416.  Dr. Vigil assessed that Mr. Penix has a slight limitation in his ability to sustain an ordinary routine without special supervision.  *Id.*  He assessed that Mr. Penix has moderate limitations in his ability to (1) perform activities within a schedule; and (2) maintain regular attendance and be punctual within customary tolerance.  *Id.*  Finally, he assessed that Mr. Penix has marked limitations in his ability to (1) maintain attention and concentration or extended periods (*i.e.,* 2-hour segments); (2) maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently; and (3) complete a normal workday and workweek without interruptions from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods.  *Id.*

The ALJ accorded little weight to Dr. Vigil's opinions.[10]  Tr. 17-18.  She explained that

> Dr. Vigil saw the claimant on one occasion for the purpose of providing evidence to support his disability claim.  Dr. Vigil's findings and restrictions are not supported by or consistent with the claimant's treatment records.  On examination, Dr. Vigil reported significant tender pressure points[], but none of the claimant's own medical providers reported these.  Dr. Vigil indicated limitations in the use of

---

[10] *See Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (explaining that according little weight is effectively rejecting opinion evidence).

both upper extremities [], but treatment notes do not show complaints related to the upper extremities or findings of abnormalities of the upper extremities and the claimant did not testify as to problems with his upper extremities.

Moreover, there are inconsistencies in Dr. Vigil's opinions.  Dr. Vigil opined the claimant could lift and/or carry less than 10 pounds occasionally [], even though the claimant had told him he could lift up to 25 pounds [].  Dr. Vigil also opined the claimant could sit for less than 4 hours in an 8 hour workday [], even though the claimant had told him he was "able to sit all day" [].  As another example of inconsistency, Dr. Vigil indicated the claimant was homeless and lived on the streets in his car [], but he testified at the hearing that he lived in a dwelling with a patio, with his girlfriend of three years.  I also note that the phrase "from before October 2014 to current examination" is typed at the top of both forms, presumably by the claimant's attorney, but that Dr. Vigil did not examine the claimant until August 2019.  Finally, on the "Non-Physical" form, Dr. Vigil opines marked limitations, apparently attributable to pain, fatigue, and sleep disturbance, but this degree of limitation is not documented in the treatment records, and the claimant was not diagnosed with any mental impairment other than non-severe substance use disorder.  Treatment notes consistently showed that the claimant's mental status presentation was normal [].  For these reasons, I give little weight to Dr. Vigil's opinion.

*Id.*

Mr. Penix argues that the ALJ failed to provide adequate reasons for according little weight to Dr. Vigil's opinions.  Doc. 23 at 10-16.  Mr. Penix first argues that the ALJ's explanation related to a single examination has been rejected by the Tenth Circuit, as has the unfair characterization of exam as improper or less trustworthy simply because it was sought or obtained by the claimant and/or his attorney.  *Id.*

Mr. Penix next argues that the ALJ's explanation that provider treatment notes do not support Dr. Vigil's fibromyalgia diagnosis or bilateral upper extremity pain fails to consider that Dr. Vigil did not definitively diagnose Mr. Penix with fibromyalgia such that it is not clear whether or to what extent the tender pressure points Dr. Vigil noted on exam affected his conclusions.  *Id.*  That aside, Mr. Penix argues that provider treatment notes demonstrate joint tenderness on physical exam and sleeping problems related to pain and that it is possible

Mr. Penix's treatment providers failed to test him for fibromyalgia because of his gender.[11]  As for Dr. Vigil's assessed limitations based on bilateral upper extremity pain, Mr. Penix argues that Dr. Vigil reviewed Mr. Penix's provider treatment notes and was aware that they did not document complaints about his upper extremities.  *Id.*  That said, as an acceptable medical source, Mr. Penix argues that Dr. Vigil was qualified to use his own medical expertise to assess functional limitations related to upper extremity pain.  *Id.*

As for the internal inconsistencies the ALJ relied on for according little weight to Dr. Vigil's opinions, Mr. Penix argues that Dr. Vigil's evaluation consisted of more than Mr. Penix's subjective reports regarding his ability to sit and lift, and included Dr. Vigil's review of provider treatment notes, as well as Dr. Vigil's observations, pain assessment and physical exam.  Doc. 23 at 13-14.  Mr. Penix argues, therefore, that Dr. Vigil was under no obligation to echo Mr. Penix's subjective reports when making his functional assessment.  *Id.*  Additionally, Mr. Penix argues that the ALJ heard testimony from Mr. Penix at the hearing explaining that although he told Dr. Vigil he could sit all day long, this actually meant "sitting with my feet up or laying down, either way," and that he put his feet up "80 percent of the time, 90 percent" every day.  *Id.*  Mr. Penix argues the ALJ also heard testimony that he had a hard time lifting a gallon jug of water for his CPAP machine.  *Id.*  Lastly, Mr. Penix argues that the record supports his homeless status throughout the relevant period of time and that he was moving from house to house.  *Id.*

Mr. Penix argues that the ALJ's explanation regarding the chronological relevance of Dr. Vigil's opinions is inadequate because the assessment forms instructed that Dr. Vigil should

---

[11] Mr. Penix cites published medical evidence relating to the prevalence of fibromyalgia diagnoses in females and that it is believed to be underdiagnosed in men.  Doc. 23 at 12.

consider Mr. Penix's "*medical history and the chronicity of findings* as from before October 2014 to current examination," which is exactly what Dr. Vigil did in reviewing treatment provider records and function reports that provided him with a longitudinal view of Mr. Penix's impairments and functioning over time and during the relevant period of time.  Doc. 23 at 14-15. Additionally, Mr. Penix argues that there is no indication that Dr. Vigil did not follow the forms' instructions to consider Mr. Penix's history or that Dr. Vigil disregarded any of the records he reviewed, nor does the ALJ point to one.  *Id.*  Mr. Penix argues that Dr. Vigil's opinions corroborate Mr. Penix's diabetic neuropathy, obesity and diabetes mellitus, all of which the ALJ found to be severe, and are, therefore, reasonably relevant to the period at issue.  *Id.*

Lastly, Mr. Penix argues that it appears the ALJ misunderstood the limitations on the "Non-Physical" medical assessment form.  Doc. 23 at 15-16.  Mr. Penix argues that Dr. Vigil indicated the limitations presented were "attributable to pain, fatigue, and sleep disturbance" and not based on a mental impairment.  *Id.*  Mr. Penix argues, therefore, that a lack of diagnosed mental impairment does not present any conflict with Dr. Vigil's opinion of Mr. Penix's ability to do work-related mental activities.  *Id.*

In sum, Mr. Penix argues that the ALJ erred in weighing Dr. Vigil's opinions and failed to provide adequate reasons for according them little weight.  Doc. 23 at 16.  Mr. Penix argues that a proper evaluation would result in a change to Mr. Penix's RFC, thereby precluding competitive work according to the VE's testimony that an individual who had to take two to three extra fifteen-minute breaks during the workday to put his feet up would not be able to sustain competitive employment.  *Id.*

The Commissioner disagrees with Mr. Penix's arguments and contends that the ALJ's explanations for according Dr. Vigil's opinion little weight are valid.  Doc. 25 at 12-18.  The

Commissioner contends that discounting opinion evidence based on the frequency of examination, in this case only one, is valid because the Tenth Circuit has held that discounting an opinion based on a single examination "by itself" is not valid, which is not the case here.  *Id.* The Commissioner also contends that it was not error for the ALJ to distinguish that Dr. Vigil rendered his opinion regarding Mr. Penix's ability to do work-related activities based on a referral from Mr. Penix's disability lawyer.

Next, the Commissioner contends that the ALJ's explanation that Dr. Vigil's findings and restrictions were "not supported by or consistent with" Mr. Penix's treatment records is a valid regulatory based finding.  *Id.*  Here, the Commissioner contends, it was reasonable for the ALJ to find that Dr. Vigil's findings of significant tender pressure points and upper extremity pain were not reported by Mr. Penix's treating providers.  *Id.*

As for other inconsistences, the Commissioner contends that Mr. Penix has failed to point to any treatment record indicating problems with lifting or carrying between 10 and 25 pounds so as to render the ALJ's findings unsupported; that Mr. Penix explicitly told Dr. Vigil he could sit all day and that it was within the ALJ's discretion to reject Mr. Penix's testimony explaining how he sat all day; that the ALJ reasonably concluded based on Mr. Penix's testimony that he was not homeless; and that it was reasonable for the ALJ to question the chronological relevance of Dr. Vigil's opinion because the forms instructed him to consider evidence from October 2014 and there was no evidence prior to July 2015 for Dr .Vigil to review.  *Id.*  Last, the Commissioner contends that the ALJ recognized that Dr. Vigil attributed Mr. Penix's mental limitations to pain, fatigue and sleep disturbance and explained that she found Dr. Vigil's assessed degree of limitation was not documented in the treatment record.  *Id.*

In sum, the Commissioner asserts that even if one of the ALJ's reasons was invalid, the ALJ provided multiple other valid reasons for discounting Dr. Vigil's conclusions. *Id.*

## B.      The ALJ's Consideration of the Medical Opinion Evidence

The applicable regulations and case law require an ALJ to consider all medical opinions and discuss the weight assigned to those opinions.[12]  *See* 20 C.F.R. §§ 404.1527(c); *see also Hamlin,* 365 F.3d at 1215 ("[a]n ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional.").  "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion."  *Hamlin*, 365 F.3d at 1215. (citing *Goatcher v. United States Dep't of Health & Human Servs*., 52 F.3d 288, 290 (10th Cir. 1995)).[13]  An ALJ's decision need not expressly apply each of the six relevant factors in deciding what weight to give a medical opinion.  *Oldham v. Astrue*, 509 F3d. 1254, 1258 (10th Cir. 2007).  However, the decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and reasons for that weight."  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  The ALJ's decision for according weight to medical opinions must be supported by substantial evidence.  *Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005).  An ALJ is required to give controlling weight to the opinion of a treating physician if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other

---

[12] The agency issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017.  *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); (Doc. 19 at 4 n.3.).  However, because Mr. Penix filed his initial claim on May 13, 2015, the previous regulations for evaluating opinion evidence apply to this matter.  *See* 20 C.F.R. 416.927.

[13] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.  *See* 20 C.F.R. § 404.1527(c)(2)-(6).

substantial evidence in the record. *Id.* Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it." *Hamlin*, 365 F.3d at 1215.

Ultimately, the ALJ must give good reasons that are "sufficiently specific to [be] clear to any subsequent reviewers" for the weight that she ultimately assigns the opinion. *Langley*, 373 F.3d at 1119 (citation omitted). Failure to do so constitutes legal error. *See Kerwin v. Astrue*, 244 F. App'x. 880, 884 (10th Cir. 2007) (unpublished). In addition, "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (citations omitted). Instead, an ALJ "must ... explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7. Further, the Commissioner may not rationalize the ALJ's decision post hoc, and "[j]udicial review is limited to the reasons stated in the ALJ's decision." *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) (citation omitted).

    **1.**    **The ALJ's Explanations for Rejecting Dr. Vigil's Opinion Regarding Mr. Penix's Ability To Do Work-Related Physical Activities**

Dr. Vigil's opinions are the *only* medical opinion evidence in this case that provide a functional assessment of Mr. Penix's ability to do work-related physical and non-physical activities.[14] The ALJ, however, rejected Dr. Vigil's opinions, as well as Dr. Pena's concurrence

---

[14] Dr. Pena, Mr. Penix's treating physician, concurred in Dr. Vigil's assessments, but he did not evaluate or prepare an assessment of Mr. Penix's ability to do work-related activities separately.

in those opinions, and failed to proffer opposing medical opinion evidence.[15]  *See generally*

*McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) ("In choosing to reject the treating

physician's assessment, an ALJ may not make speculative inferences from medical reports and

may reject a treating physician's opinion outright only on the basis of contradictory medical

evidence and not due to his or her own credibility judgments, speculation or lay opinion.").

Instead, the ALJ parsed through Dr. Vigil's opinions and treatment provider notes taking only

the parts favorable to a finding of nondisability, and nitpicked Mr. Penix's subjective statements,

relying on some while rejecting others without explanation.  This is error.  *Haga,* 482 F.3d at

1208.

　　　For example, the ALJ outright rejected Dr. Vigil's opinions based on certain

inconsistencies, such as his assessments of probable fibromyalgia and upper extremity pain, both

of which were not previously diagnosed and/or treated in treatment provider notes.  But in doing

so, the ALJ completely ignored every other aspect of Dr. Vigil's opinions that are supported by

the medical evidence record, such as his assessments of and functional limitations related to

chronic pain, diabetes mellitus with neuropathy, morbid obesity, and obstructive sleep apnea.

This is error.  *See Clifton,* 79 F.3d at 1009 (in addition to discussing evidence supporting her

decision, the ALJ also must discuss the uncontroverted evidence she chooses not to rely upon, as

---

[15] The ALJ accorded *limited weight* to non-examining State agency medical consultants Mark Werner, M.D., and Edward Bocian, M.D., "to the extent that they are consistent with my residual functional capacity for a range of light work[.]" Tr. 18.  The ALJ cites Exhibits 4A and 5A.  Tr. 67, 68.  These exhibits are one-page *Disability Determination and Transmittal* forms.  *Id.*  Exhibit 4A reflects that on April 26, 2016, Mr. Penix's initial Title II application was denied.  *Id.* Mark Werner, M.D., is listed as the disability examiner.  *Id.* at box 32A.  Exhibit 5A reflects that on September 20, 2016, Mr. Penix's Title II application was denied at reconsideration.  Tr. 68.  Edward Bocian, M.D., is listed as the disability examiner.  *Id.* at box 32A.  Neither of these forms reflect a residual capacity assessment prepared by either nonexamining medical consultant.  The ALJ, therefore, assigned greater weight to nonexistent medical opinion evidence she presumed to be in the record but is not.  This is error.  *Langley*, 373 F.3d at 1119 (the ALJ must give good reasons that are "sufficiently specific to [be] clear to any subsequent reviewers" for the weight that she ultimately assigns the opinion).  In sum, the ALJ's weighing of nonexistent but presumed medical opinion evidence is anything but clear and questionably improper.

well as significantly probative evidence she rejects); *see also Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (citing *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984)) (an ALJ may not engage in improper picking and choosing from the medical reports and use portions favorable to her position while ignoring other evidence).

The ALJ also rejected Dr. Vigil's opinions based on inconsistencies between Mr. Penix's statements to Dr. Vigil regarding the *most* weight he can lift, *i.e.,* 25 pounds, and that he is "able to sit all day," and Dr. Vigil's assessed limitations in those areas.  In doing so, however, the ALJ gave full faith and credit to Mr. Penix's self-reported abilities to lift and sit despite his explanatory testimony at the Administrative Hearing, yet found that Mr. Penix's self-reported limits on his ability to walk,[16] his exacerbated pain with household chores, his difficulty climbing stairs, and his reported history of homelessness were unreliable.[17]   This picking and choosing without explanation is error.  *Id.*

In light of the foregoing errors, the ALJ's other explanations for rejecting Dr. Vigil's opinion regarding Mr. Penix's ability to do work-related physical activities are insufficient.  The

---

[16] Mr. Penix reported he could walk and/or stand 5 to 10 minutes at a time and that it was difficult for him to walk up and down stairs for fear of his knees giving out and falling.  Tr. 419.  Dr. Vigil opined that Mr. Penix could stand and/or walk for less than two hours in an eight-hour workday and required the use of an assistive device to ambulate, for balance, and/or reduce pain.  Tr. 415.  By way of background, Mr. Penix testified that he began using a cane in 2014 to help with balance and because his legs were getting weak and his feet were painful and numb.  Tr. 41.  On August 13, 2015, treating provider, CFNP Osuchowski-Sanchez, completed paperwork for Mr. Penix to obtain a handicap placard due to chronic pain in his legs and great difficulty walking distances.  Tr. 384.  On November 28, 2016, CFNP Osuchowski-Sanchez prescribed a cane.  Tr. 408.  Elsewhere in the determination the ALJ stated that the record demonstrated that "while the claimant may use a cane on occasion, *it is not medically necessary*."  Tr. 16 (emphasis added).  This is improper lay opinion.  *Langley*, 373 F.3d at 1121.  It is the task of the treating physician, not the ALJ, to reach medical conclusions based on the medical record, which, in this case, included Mr. Penix's need for a cane to assist with ambulation.

[17]  The Court finds that the ALJ improperly mischaracterized Mr. Penix's statement about his homelessness and staying with his girlfriend to find an inconsistency.  On November 10, 2015, Mr. Penix reported in his Function Report that he was homeless and stayed wherever he could find a place to sleep and shower.  Tr. 179.  His daughter reported the same.  Tr. 171.  On July 26, 2018, Mr. Penix reported to Dr. Benton that he was living with friends, but was essentially homeless.  Tr. 340.  When asked about household chores at the Administrative Hearing on October 2, 2019, Mr. Penix testified that he and his girlfriend shared cooking, but that she did dishes, laundry, vacuuming, cleaning and gardening.  Tr. 56.  Mr. Penix said he met his girlfriend in 2016.  *Id.*  Mr. Penix also testified about floating from house to house "pretty much 'cause I'm homeless."  Tr. 57.

Tenth Circuit has rejected that a single, attorney-referred, exam is a legitimate basis for rejecting medical opinion evidence. *Chapo*, 682 F.3d at 1291 (explaining that the status of an examining source opinion is not by itself a reason for rejecting it); *McGoffin*, 288 F.3d at 1253 (explaining that rejecting an opinion on the basis of advocacy is a mere "conclusory statement"). Further, the ALJ's explanation that Dr. Vigil's exam in August 2019 renders his opinion invalid before that date is equally insufficient. Here, Dr. Vigil conducted a consultative examination/impairment rating after which he filled out forms that asked him to opine on Mr. Penix's condition since October 2014.[18] To that end, Dr. Vigil reviewed Mr. Penix's provider treatment records from 2015 to 2019, and opined under penalty of perjury that "*[a]fter a careful review of the medical record* and conducting a consultative evaluation and functional impairment rating . . . it is my opinion that within a reasonable medical probability . . . ." Tr. 422 (emphasis added). The Commissioner has offered no reason to doubt that Dr. Vigil was faithful to the forms' instructions. Moreover, provider treatment notes from 2015 and forward support many of Dr. Vigil's diagnoses. The ALJ's explanation, therefore, failed to consider this supporting evidence.

> **2.      The ALJ's Explanations for Rejecting Dr. Vigil's Opinion Regarding Mr. Penix's Ability To Do Work-Related Mental Activities**

The ALJ also erred in rejecting Dr. Vigil's opinion regarding Mr. Penix's ability to do work-related mental activities by relying on the absence of a diagnosed mental impairment. Here, Dr. Vigil's opinion was premised on pain and fatigue resulting from his physical impairments. Although the Commissioner correctly notes that the ALJ stated in her

---

[18] The Administrative Record did not contain any medical evidence record prior to July 9, 2015. Mr. Penix's disability lawyer explained at the Administrative Hearing that Mr. Penix moved to New Mexico in June of 2015, "and that is when his evidence begins." Tr. 37.

23

determination that Dr. Vigil's opined marked limitations were "apparently attributable to pain, fatigue, and sleep disturbance," the ALJ nonetheless went on to explain that Mr. Penix had not been diagnosed with any mental impairment to support of her rejection of Dr. Vigil's assessed limitations. Tr. 18. That said, even if the Court were to assume that the ALJ correctly considered Mr. Penix's nonexertional limitations as attributable to pain and fatigue, as opposed to a mental impairment, she failed to apply the correct legal standard in doing so.

"A claimant's subjective allegation of pain is not sufficient in itself to establish disability." *Thompson*, 987 F.2d at 1488 (citing *Gatson v. Bowen*, 838 F.2d 442, 447 (10th Cir. 1988)). Instead, before an ALJ need even consider any subjective evidence of pain or other symptoms, the claimant must first prove by objective medical evidence the existence of a pain or fatigue producing impairment that could reasonably be expected to produce the alleged disabling pain and fatigue. *Id.* (citing *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987)). If a claimant does so, the ALJ must then consider whether there is a "loose nexus" between the proven impairment and the subjective complaints of pain. *Id.* If there is a loose nexus, the ALJ considers all of the evidence, both objective and subjective, to determine whether the pain is disabling. *Id.* Even if pain is not disabling, it "is still a nonexertional impairment to be taken into consideration, unless there is substantial evidence for the ALJ to find that the claimant's pain is insignificant." *Thompson*, 987 F.2d at 1491.

The first step in the three-step analysis of subjective symptoms is to determine whether objective medical evidence demonstrates the existence of a pain- or other symptom-producing impairment. Here, the ALJ determined that Mr. Penix had the severe impairments of diabetes mellitus, diabetic neuropathy, and obesity. Thus, Mr. Penix proved by objective medical evidence the existence of pain- and fatigue-producing impairments. *Thompson*, 987 F.2d at

1488.  As such, the ALJ was required to determine whether there is a "loose nexus" between

Mr. Penix's proven impairments and his subjective complaints, and then decide whether

Mr. Penix's complaints of disabling pain and fatigue are credible.  *Id.* at 1489.

      "Credibility determinations are peculiarly the province of the finder of fact, and we will

not upset such determinations when supported by substantial evidence."  *Wilson v. Astrue*, 602

F.3d 1136, 1144 (10th Cir. 2010) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)

(internal quotation omitted)).  Nevertheless, an ALJ's credibility finding "should be closely and

affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Id.;*

*see also* SSR 16-3p, 2016 WL 1119029, at *9 ("[I]t is not sufficient for our adjudicators to make

a single, conclusory statement that 'the individual's statements about his or her symptoms have

been considered' or that 'the statements about the individual's symptoms are (or are not) supported

or consistent.'").  When assessing a claimant's credibility, the ALJ considers:

> (1) The claimant's daily activities;
> (2) The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> (3) Factors that precipitate or aggravate the symptoms;
> (4) The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate symptoms;
> (5) Treatment, other than medication, the claimant receives or has received for his symptoms;
> (6) Any measures other than treatment the claimant uses or has used to alleviate his symptoms;
> (7) Any other factors concerning the individual's functional limitations and restrictions due to his symptoms.

SSR 16-3p, 2017 WL 5180304, at *7-8.  Further, in determining the credibility of pain testimony,

the ALJ should also ordinarily consider such factors as

> the frequency of medical contacts, . . . subjective measures of credibility that are
> peculiarly within the judgment of the ALJ, the motivation of and relationship
> between the claimant and other witnesses, and the consistency or compatibility of
> nonmedical testimony with objective medical evidence.

*Thompson*, 987 F.2d at 1488 (citing *Hargis v. Sullivan*, 945, F.2d 1482, 1489 (10th Cir. 1991)

(quoting *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988))).   Tenth Circuit precedent "does

not require a formalistic factor-by-factor recitation of the evidence . . . [s]o long as the ALJ sets

forth specific evidence he relies on in evaluating the claimant's credibility." *Poppa v. Astrue*, 569

F.3d at 1171 (quoting *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)); *see also Thompson*,

987 F.2d at 1490 (no "talismanic requirement that each factor . . . be addressed").

In the present matter, the ALJ appears to have found Mr. Penix not credible because of

his lack of compliance with prescribed treatment (Tr. 16) and because he made various

statements to his treatment providers regarding his lifestyle that the ALJ believed were

inconsistent with the level of incapacity he alleged (Tr. 17).   As to the former, before the ALJ

may rely on the claimant's failure to pursue treatment or take medication as support for her

determination of noncredibility, she should consider "(1) whether the treatment at issue would

restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the

treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse." *Frey,*

816 F.2d at 517 (citing *Weakley v. Heckler,* 795 F.2d 64, 66 (10th Cir.1986) (quoting *Teter,* 775

F.2d at 1107)).   The ALJ failed to address all of these factors.   As to the latter, a claimant's daily

activities is only one of several factors the ALJ should consider in determining the credibility of

pain testimony.   While *Thompson* instructs there is not a talismanic requirement that each factor

be addressed, the Court finds the ALJ's sole reliance on Mr. Penix's daily activities falls short of

the legal standard.   In sum, the ALJ's credibility finding is not closely and affirmatively linked to

the substantial evidence as required.

For the foregoing reason, the Court finds that the ALJ failed to apply the correct legal standards in weighing Dr. Vigil's opinions and that her reasons for rejecting his opinions are not supported by substantial evidence.  This case, therefore, requires remand.

**C.**     **Remaining Issues**

The Court will not address Mr. Penix's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

**IV.  Conclusion**

For the reasons stated above, Mr. Penix's Motion for Remand (Doc. 23) is **GRANTED** and this matter is remanded for additional proceedings.

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge,**
**Presiding by Consent**

27